**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
Igor Krishtul

                    Plaintiff,

        -against-

VSLP United, LLC,

                   Defendant.
-----------------------------------------------------X

               **FINDINGS OF FACT &**
               **CONCLUSIONS OF LAW**

               10–CV–0909 (RER)

**RAMON E. REYES, JR., U.S.M.J.:**

      Igor Krishtul ("Krishtul") brought this action against VSLP United, LLC ("VSLP")

pursuant to the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. ("TILA") to rescind two loans he

received from VSLP and to void the lien on his co-operative apartment.  Krishtul also demands

damages, attorney's fees, and costs.  The parties consented to my jurisdiction to decide their

cross-motions for partial summary judgment (Dkt. No. 9) and to conduct all proceedings,

including trial and entry of final judgment (Dkt. No. 32).  After denying VSLP's summary

judgment motion, the Court presided over a two-day bench trial and heard testimony from

Krishtul, Leonid Raytburg ("Raytburg"), David Zybin ("Zybin"), and John VanderNeut

("VanderNeut") and received various exhibits into evidence.  (*See* Minute Entry dated 2/19/13;

Minute Entry dated 2/20/13.)  At the Court's direction, the parties subsequently submitted

proposed findings of facts and conclusions of law.  (*See* Dkt. Nos. 80 ("VSLP's FFCL"); 87

("Krishtul's FFCL").)

      The central factual disputes to be resolved at trial concerned whether TILA applies to the

loans at issue.  (*See* Dkt. No. 28 ("Mem. & Order") at 18, 21.)  Having considered all of the

evidence at trial, assessed the credibility of the witnesses, and reviewed the parties' post-trial

submissions, the Court concludes that TILA does not apply to the subject loans and that VSLP is entitled to reasonable attorney's fees and costs pursuant to the loan documents. The following constitutes the Court's findings of facts and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

### A.    Procedural History

The Court begins with a brief review of the procedural history to account for certain developments that affected the prosecution of this case. The parties submitted their Joint Pretrial Order on July 10, 2012. (Dkt. No. 29 ("Joint Pretrial Order").) Soon after the Court set October 22, 2012 as the trial date, Krishtul's former counsel, Randy Newman ("Newman"), sought to withdraw as counsel and to assert a charging lien pursuant to New York Judiciary § 475. (Dkt. No. 31.) After conducting a hearing, at which Krishtul was present, the Court relieved Newman as counsel, leaving the determination of the amount of the charging lien for a later evidentiary hearing, and adjourned the trial to January 15, 2013. (*See* Amended Minute Entry dated 9/25/12.) The Court ordered the parties to submit their pre-trial submissions by January 4, 2013 and advised Krishtul that counsel must appear on his behalf by November 30, 2012, or that he would be expected to proceed *pro se*. (*Id.*) On December 5, 2012, nearly a week after the Court's deadline, John E. Tiffany ("Tiffany") entered a notice of appearance on behalf of Krishtul. (Dkt. No. 35.) The Court held a status conference on December 11, 2012, at which both Newman and Tiffany, were present. (*See* Minute Entry dated 12/13/12.) The Court ordered Tiffany to file a joint motion to adjourn the bench trial, if necessary, by December 21, 2012. (*Id.*)

That deadline passed with no request for an adjournment. On January 2, 2013, the Court issued a notice requiring the parties to file a joint motion to adjourn the bench trial, if so desired,

that same day.  (*See* Notice dated 1/2/13.)  No such request was made.  Pursuant to the Court's previous scheduling order, the parties' pre-trial submissions were due on January 4, 2013. Krishtul failed to comply with that deadline and the Court unsuccessfully attempted to call Tiffany as a courtesy.  (*See* Staff Note dated 1/8/13.)  The Court then issued a written notice expressly warning Krishtul that a failure to appear at the January 15, 2013 trial would result in an order dismissing his claims for failure to prosecute.  (Dkt. No. 40.)

Just days before the trial date, Krishtul, through his counsel Tiffany, filed a letter requesting to adjourn the trial until March 2013.  (Dkt. No. 42.)  VSLP strenuously objected to that request.  (Dkt. No. 43.)  The Court convened a telephone conference, at which it reluctantly adjourned the bench trial to February 19, 2013, with pre-trial submissions due on February 1, 2013.  (Minute Entry dated 1/11/13.)  The Court admonished "NO FURTHER ADJOURNMENTS FOR ANY REASON WHATSOEVER."  (*Id.*)  Once again that deadline for pre-trial submissions passed with no word from Krishtul.

VSLP promptly filed a motion to dismiss for lack of prosecution, wherein it accurately catalogued Krishtul's disregard for the Court's orders affecting the bench trial.  (Dkt. No. 45 at 1-3.)  Krishtul filed no opposition.  Nonetheless, the Court denied VSLP's motion, recognizing that Krishtul had previously filed a Joint Pretrial Order, and that dismissal for failure to prosecute is a "drastic remedy."  (Order denying Motion to Dismiss for Lack of Prosecution dated 2/14/13.) But "in light of [Krishtul's] failure to adhere to the [February 1, 2013 deadline for pre-trial submissions]," the Court granted VSLP's motion *in limine* as unopposed.  (*Id.*; *see also* Order granting Motion in Limine dated 2/14/13.)

On the day of trial, Tiffany moved to be relieved as counsel, complaining that he had not

3

been "paid a dime for [his] work" (2/19/13 Tr. at 6:16-17), and that Krishtul had not assisted in

trial preparation (*see, e.g.*, *id.* at 8:17-23.)  With regard to his failure to timely advise the Court of

these issues, Tiffany conceded that he "should have written to the Court," (*id.* at 9:25-10:1), and

stated only "I can sit here and give all sorts of excuses.  I'm not going to give an excuse."  (*Id.* at

10:2-3.)  Although "tak[ing] responsibility for not addressing [the issue] and sending a letter to

the Court" (*id.* at 10:9-10), Tiffany admitted to the Court that he was "not prepared" to go

forward with the trial (*id*. at 12:8).  A query to Krishtul about his failure to advise the Court

about issues concerning his representation was met only with silence.  (*Id.* at 11:3-5.)

The Court presented Krishtul with two options: one, Krishtul could proceed with trial,

either with Tiffany representing him or proceeding *pro se*, or two, the Court would grant VSLP's

motion to dismiss, which Krishtul could appeal.  (*Id.* at 12:24-13:2; 13:16-18.)  The Court

recalled its previous admonishment that no further adjournments would be entertained and

emphasized the prejudice that yet another delay would impose on both VSLP and the Court.  (*Id.*

at 13:3-15.)  Krishtul opted to proceed with trial and the Court denied Tiffany's motion to

withdrawal as counsel.  (*Id.* at 13:20, 15:3-6.)

Although the parties estimated in the Joint Pretrial Order that five trial days would be

needed (Joint Pretrial Order at 3), the bench trial lasted not two full days.  The Court heard

testimony and received as evidence those exhibits to which the parties previously stipulated in

the Joint Pretrial Order.  (2/19/13 Tr. at 66:5-67:3.)  The Court afforded the parties the

opportunity to submit proposed findings of facts and conclusions of law by March 8, 2013.

(2/20/13 Tr. at 152:2-3.)  Only VSLP timely filed a submission.

On March 13, 2013, Krishtul filed a letter*, pro se*, requesting additional time to submit his

4

proposed findings of facts and conclusions of law.  (Dkt. No. 82. )  Krishtul explained that, although Tiffany's conduct at trial was "indeed odd and unusual," he and Tiffany had resolved their differences.  (Dkt. No. 81.)  Krishtul averred that he had communicated with Tiffany since the close of trial and that he had provided Tiffany with "several hundred documents" in anticipation of the proposed findings of facts and conclusions of law.  (*Id.*)  Krishtul attested that, until his conversation with Tiffany on March 8, 2013, he was unaware that Tiffany failed to file the proposed findings of fact and conclusions of law on his behalf.  (*Id.*)  During their conversation, Tiffany explained to Krishtul that he was experiencing stress arising from "serious problems, including being suspended from practicing law."  (*Id.*)[1]  The Court extended the time for Krishtul to submit his post-trial submissions to March 29, 2013.

Krishtul filed *pro se* his proposed findings of facts and conclusions of law.  (Krishtul's FFCL.)  His submission is replete with statements and documents that were not presented at the bench trial.  Some purported documents and accounts of alleged telephone conversations are offered for the first time in these proceedings.  (*See, e.g.*, Krishtul's FFCL at 3-5; Dkt. No. 87-1, at 1 (sample advertisements by Patrick of Broadscope); 87-1, at 3-14 (2008 email exchange regarding mortgage loan and "coop" search); Dkt. No. 87-1, at 161-75 (purported phone

---

[1]  By a Corrected Decision dated December 12, 2012, the Supreme Court of New Jersey suspended Tiffany from the practice of law before that court for three months.  (13–mc–00149, Dkt. No. 1 at 24.)  The Court did not know of Tiffany's suspension until after the trial began.  At that time, however, Tiffany was not suspended from the rolls of attorneys in this District.  Pursuant to Local Rule 1.5, Judge Cogan, in his capacity as Chairman of the Committee on Grievances for the Eastern District of New York, issued an order dated March 6, 2013 suspending Tiffany from practice before this Court, effective twenty-four days after service of the order on Tiffany.  (Dkt. No. 2.)  On March 8, 2013, the Court notified Krishtul and Hall of Tiffany's suspension by regular mail and ECF notification, respectively.  (*See* 13–mc–00149, Copy of Documents Mailed dated 3/8/13.)

records).)  Other documents and alleged statements concern purported emails that were the
subject of VSLP's unopposed *in limine* motion to exclude certain documents from trial.  (*See*
Dkt. No. 87 *in passim*; *see, e.g.*, 87-1, at 3- 87-1, at 21-27.)   Through his submission, Krishtul
provides a version of events markedly different than that offered by VSLP, and seeks to create
the record that he did not create at trial.  In short, Krishtul relies heavily on evidence not properly
before the Court.  Thus, while the Court has considered the parties' post-trial submissions, it
affirms that the following facts and conclusions of law are based solely on the evidence received
at trial.

B.      **Findings of Fact**

The application of TILA to the loans depends on two distinct issues: (1) whether the
subject loans are "consumer credit transactions" for purposes of TILA and (2) whether the
mortgage loan extended by VSLP in 2007 originated through a "mortgage broker" such that
VSLP is a "creditor" within the meaning of TILA.  Following a recitation of the basic facts, the
Court makes factual findings as to each issue in turn.

1.      ***Basic Facts***

Krishtul is the owner of a co-operative apartment located at 1311 Brightwater Ave., Apt.
9D, Brooklyn, New York 11235 (the "Co-op") and has resided at that address since 1994.  (Dkt.
No. 29-1 ("Joint. Stip. of Facts") ¶ 1; 2/19/13 Tr. at 25:12-13.)  He earned a bachelor's degree in
accounting and worked as a field agent for the Internal Revenue Service.  (Joint Stip. of Facts ¶¶
22-23.)  Krishtul is a chartered financial consultant and is licensed to sell insurance.  (*Id.* ¶¶ 24-
25.)  For the last fifteen years, he has earned his livelihood preparing tax returns and selling
insurance.  (See *id.* ¶ 26.)  Since 2001, Krishtul has conducted his tax preparation and insurance

sales business through Krishtulco, Inc. ("Krishtulco"), of which he is sole shareholder. (*Id.* ¶ 27.)

When Krishtul first purchased the Co-op in 1994, he obtained a loan from the developer in the amount of $125,000. (2/19/13 Tr. at 59:22-60:3.) In 2002, Krishtul obtained another loan secured by the Co-op in the amount of $125,000 from Emigrant Mortgage Company, Inc. (the "Emigrant Loan"). (Joint Stip. of Facts ¶ 3.) His reasons for obtaining the Emigrant Loan appear to stem from his divorce. (*See* 2/19/13 Tr. at 59:10-13 ("This was due to divorce because I had a very bitter situation which involved both state supreme court as well as family court."); *id.* at 60:7 ("[M]y hands were tied because of my family situation.").) Krishtul failed to pay the Emigrant Loan and Emigrant Mortgage Company instituted a nonjudicial co-op foreclosure. (Joint Stip. of Facts ¶ 3.) To prevent foreclosure, Krishtul obtained a one-year loan in the amount of $250,000 from Anotoly Lipkin ("Lipkin") in April or May 2006 (the "Lipkin Loan"), which was due in full on February 17, 2007. (*Id.* ¶¶ 4-5; 2/19/13 Tr. at 26:10-18.) Krishtul used the Lipkin Loan to satisfy the $125,000 Emigrant Loan, to pay $50,000 in child support, and to finance the fees and costs associated with the transaction. (2/19/13 Tr. at 60:16-25.) Around January 2007, Krishtul sought to refinance the Lipkin Loan. (*Id.* at 27:21-24.) At some point, under circumstances that the parties contest, Krishtul came into contact with Zybin, a Senior Vice President at Stanley Capital Mortgage, Inc. ("Stanley Capital"). (*See* Joint Stip. of Facts ¶ 6.) Zybin put Krishtul in touch with Raytburg, who owns defendant VSLP. (*Id.* ¶¶ 6, 7, 28.) Raytburg contacted Krishtul to arrange for an inspection of the Co-op on February 4, 2007. (*Id.* ¶¶ 8-9.)

On March 20, 2007, VSLP extended Krishtul a one-year loan in the amount of $375,000 at 14%, due in full on April 1, 2008 (the "2007 VSLP Loan"). (*See* Pl. Exh. 23 ("Cooperative

7

Apartment Note").)  The loan also involved a disputed number of points[2] payable up-front.

(*Compare* 2/19/13 Tr. at 36:20-21 (Krishtul attesting that he accepted a loan in the amount of

"$375,000 and five points") *with id.* at 100:5 (Raytburg describing the loan as "14 percent

interest and two points, origination points").)  The 2007 VSLP Loan was secured by a lien on the

Co-op.  (*See* Pl. Exh. 24 ("Loan Security Agreement").)

 The parties dispute whether the closing occurred at the office of VSLP's attorney

VanderNeut in Staten Island or at Zybin's office in Brooklyn.  (*Compare* 2/20/13 Tr. at 128:10-

13 *with* 2/19/13 Tr. at 53:21-54:1.)  At the closing, VSLP was represented by VanderNeut and

Krishtul was accompanied by an attorney named Igor Dodin.  (Joint Stip. of Facts ¶¶ 11, 35.)

VanderNeut prepared a disbursement sheet to reflect "how the proceeds of the loan were cut."

(2/20/13 Tr. at 131:2-7; Pl. Exh. 26 ("Mortgage Disbursement Sheet Without Notations").)  The

Mortgage Disbursement Sheet was later modified to reflect a reduction from $97,505.84 to

$71,255.84 in loan proceeds disbursed to Krishtul, the difference constituting six months of

interest payments.  (Pl. Exh. 27 ("Mortgage Disbursement Sheet with Notations").)[3]  Other

notable disbursements include $256,328.18 to satisfy the Lipkin Loan, $7,500 to Broadscope

Capital, LLC ("Broadscope"), and $3,7500.00 to Yuri Epelman ("Epelman").  (*See* Mortgage

Disbursement Sheet with Notations; Mortgage Disbursement Sheet Without Notations.)

---

 [2] As Krishtul testified, one point equals one percent of the loan amount (2/19/13 Tr. at
45:24-46:1), with each point worth approximately $4,000 (*id.* at 53:12-13).

 [3] The parties dispute whether the withholding of six months of interest payments was a
unilateral decision made by VSLP.  (*Compare* 2/19/13 Tr. at 87:1-10 *with id.* at 9:7-8 *and*
2/20/13 Tr. at 138:12-21.)  The Court concludes that the resolution of this factual dispute is
unnecessary for the disposition of this matter.

Krishtul did not refinance the 2007 VSLP Loan with another lender, and Raytburg agreed to extend the 2007 VSLP Loan for an additional two years at 12 percent interest with four points financing.  (Join Stip. of Facts ¶ 17.)  On or about July 1, 2008, Krishtul signed a new Cooperative Apartment Loan, dated April 1, 2008, in the amount of $390,000, the $15,000 difference being the four points that he financed (the "2008 VSLP Loan").  (*Id.* ¶ 18; *see also* Pl. Exh. 31 ("2008 Cooperative Apartment Note"); Pl. Exh. 32 ("2008 Loan Security Agreement".)  The parties completed the 2008 VSLP Loan by mail.  (2/20/13 Tr. at 141:23-24.)

By letter dated December 18, 2009, VSLP notified Krishtul that the 2007 and 2008 VSLP Loans were in default and accelerated the entire principal balance and all other sums due under the note.  (Joint Stip. of Facts ¶ 19.)  Krishtul's attorney, Newman, responded by letter notifying VSLP and VanderNeut that Krishtul desired to rescind the 2007 and 2008 VSLP Loans pursuant to TILA.  (*Id.* ¶ 20; *see also* Pl. Exh. 33.)  To date, VSLP has refused to rescind either loan.  (*Id.* ¶ 21.)

## 2.   *Evidence Regarding Purpose of the 2007 VSLP Loan*

Krishtul testified that his purpose for obtaining the 2007 VSLP Loan was to refinance the Lipkin Loan, as Lipkin indicated that he would not extend the term of the loan.  (*See* 2/19/13 Tr. at 27:7-15.)  Krishtul further testified that the Lipkin Loan was a one-year loan so he "had no choice."  (*Id.* at 26:4-5.)  His testimony is reconcilable with that of Zybin, who testified that Krishtul approached him" to get [a] refinance on his current mortgage at the time . . . looking for a cash out."  (2/20/13 Tr. at 113:20-23.)

Raytburg's testimony, on the other hand, more clearly rebuts Krishtul's testimony. Raytburg avers that Zybin introduced Krishtul as "someone who is looking for [a] business

loan." (2/19/13 Tr. at 94:5-6.)  Raytburg testified that Zybin provided him with Krishtul's telephone number and "did not discuss loan terms with [him]." (*Id.* at 95:23.)  Raytburg further testified that, as a matter of policy, VSLP only offers business purpose loans.  (*Id.* at 95:10-11). Nevertheless, Raytburg testified that he understood that Krishtul intended to use the loan to "establish[] his good credit spending and refinanc[e] in half a year" (2/19/13 Tr. at 97:14-15), a seemingly personal use of the loan proceeds.  (*See id.* at 97:11-14 ("And [Krishtul] said he planned to fix up his own credit. The way he intend[ed] to fix up his credit was to use the proceeds from the loan, somehow taking money from one account to another account . . . .") Ultimately, VSLP extended Krishtul a loan in the amount of $375,000.  Krishtul used $256,328.18 to satisfy the Lipkin loan and took out $71,255.84 in cash.  (*See* Mortgage Disbursement Sheet with Notations; Mortgage Disbursement Sheet Without Disbursements.)

The parties dispute the disposition of the $71,255.84 cash-out proceeds.  Krishtul avers that he used the money "virtually exclusively to payoff the interest" on the loan (2/19/13 Tr. at 49:24-25) and to pay child support (*Id.* at 51:4-5.)  Krishtul offers no documentary evidence to corroborate his use of the cash-out proceeds.  On the other hand, VSLP maintains that Krishtul used the cash-out proceeds in connection with his business.  Raytburg testified that, during his inspection of the Co-op, the apartment was set up as an office space.  (2/19/13 Tr. at 96:8-18.) Moreover, VSLP offers the corporate tax returns for Krishtulco, Inc. for 2007, 2008, and 2009, which provide 1311 Brightwater Ave., Apt 9D as the address of Krishtulco, Inc. and reflect deductions for the interest paid on the 2007 and 2008 VSLP Loans.  (Joint Stip. of Facts ¶¶ 40-41; *see also* Def. Exhs. 1-4 (collectively, "Krishtulco Tax Returns").)  Finally, VSLP highlights that Krishtul deposited the $71,255.84 in cash-out proceeds into the corporate business account

of Krishtulco (Joint Stip. of Facts ¶ 36) and paid nearly all of the loan payments as well as the

legal fees for the 2008 VSLP with checks drawn on the corporate business account of Krishtulco.

(Joint Stip. of Facts ¶¶ 39, 42; Def. Exhs. 5, 7-8.)

By way of explanation, Krishtul testified that he used his business account in connection

with the 2007 VSLP Loan because the City had closed his personal accounts due to child support

issues (2/19/13 Tr. at 84: 5-13) and that he took the interest deduction on his Subchapter S

Corporation tax returns to reduce the risk of an audit (*id.* at 84:16-85:16).  However, he provides

no evidence other than his conclusory testimony to support such claims.

Having weighed the evidence, the Court concludes as a factual matter that Krishtul's

principle reason for obtaining the 2007 VSLP Loan was to refinance the Lipkin Loan, which was

near maturity.  The Court credits Krishtul's testimony that he needed to find a refinancing source.

Neither the testimony of Zybin nor Raytburg persuades the Court the Krishtul principally sought

a cash-out.  Zybin did not characterize the loan as for a business purpose.  Nor did he

acknowledge that he referred Krishtul to Raytburg knowing that VSLP only made business

purpose loans.  Indeed, Zybin offered no testimony regarding his understanding of the loan

purpose, except to say that Krishtul came to him seeking to refinance and to obtain a cash-out.

(2/20/13 Tr. at 113:20-23.)

As for Raytburg, while he testified as to his reasons for leaving the residential mortgage

brokerage business and his standing policy to make only business loans (2/19/13 at 93:5-13,

95:10-11), he acknowledged that Krishtul planned to use the loan proceeds "to fix up his own

credit."  (*Id.* at 97:11.)  Additionally, the Court affords little weight to Raytburg's conclusory

testimony that Zybin referred Krishtul to him for a business purpose loan, particularly as his

11

testimony lacks corroboration from Zybin.  Finally, the Court acknowledges that, in its post-trial submission, VSLP avers that Krishtul informed Raytburg that the purpose of the transaction was to obtain capital for a new "credit repair business."  (VSLP FFCL ¶ 21.)  But Raytburg provided no testimony to this effect.  To the contrary, Raytburg testified that Krishtul "brushed [him] off," boasting that he was a "sophisticated business person . . . involved in credit repair business."  (2/19/13 at 97:5-6.)  By Raytburg's own account, then, Krishtul did not need capital for a *new* credit repair business.

Notwithstanding its conclusion that the refinance was the primary reason for obtaining the 2007 VSLP Loan, the Court finds that the weight of the evidence establishes that Krishtul used the cash-out proceeds, at least in part, in connection with his business, Krishtulco.  Krishtul's uncorroborated testimony simply cannot overcome the inference drawn from the business records received as evidence at trial.  Thus, the Court concludes that at least some of the cash-out proceeds was used for a business purpose.

### 3. *Evidence Regarding Compensation to a Mortgage Broker*

Krishtul contends that he "reached out to different mortgage brokers who introduced [him] to VSLP."  (2/19/13 Tr. at 28:18-19).  These "middlemen" included Patrick Donahue ("Donahue") of Broadscope Capital, Will Turner ("Turner") of First Capital, and Zybin.  (*See* 2/19/13 Tr. at 32:10-33:24, 34:4-20, 50:16-20.)  Krishtul avers that Zybin and VanderNeut informed him at the closing that "the total compensation to brokers would be five points and they started to breakdown who would get the points."  (2/19/13 Tr. at 53:3-6.)  As reflected in the Mortgage Disbursement Sheets, and consistent with a contemporaneous written authorization signed by Krishtul, VanderNeut made disbursements to Broadscope Capital and Epelman.  (*See*

Mortgage Disbursement Sheet with Notation; Mortgage Disbursement Sheet without Notation;

Pl. Exh. 28 ("Cancelled Checks").)  However, the authorization provided that such

disbursements were payment for "services provided outside of this loan transaction with VSLP

United, LLC dated 3/20/2007."  (Def. Exh. 6 ("Krishtul Statement").)

        Although Krishtul maintains that other mortgage brokers were involved, he contends that

"[t]he main player, basically, was Mr. Zybin." (2/19/13 Tr. at 57:14-16.)  Nonetheless, Krishtul

admits that it was Turner, and not Zybin, who initially offered him by email "two different

options . . . [with] different rates and points."  (*Id.* at 36:14-18.)  Krishtul informed Turner in

writing and by telephone which loan option was acceptable.  (*Id.* at 36:19-20; 38:2-5)  However,

Krishtul provided no evidence at trial to corroborate such communications with Turner.  Nor did

he provide persuasive evidence linking Turner and Zybin, stating only that on one occasion

Turner referenced work performed by "'local resources.'" (*Id.* at 43:13-21.)  Indeed, other than

his own testimony—which is squarely contradicted by Raytburg, Zybin and

VanderNeut—Krishtul offered no evidence at trial to establish Donahue's or Turner's

involvement in the transaction.

        Moreover, Krishtul provided little evidence regarding Zybin's alleged mortgage broker

activities, much less fees paid for same.  Zybin undisputedly put Krishtul in touch with Raytburg

(Joint Stip. of Facts ¶ 28), which establishes Zybin's involvement in the transaction.  But

Krishtul admits that he did not enter into a written mortgage brokerage agreement with Zybin.

(Joint Stip. of Facts ¶ 29.)  And there is no dispute that Zybin neither obtained Krishtul's credit

report nor ordered an appraisal of the Co-op.  (Joint Stip. of Facts ¶¶ 30-31.)  Nonetheless,

Krishtul avers that he knows two points were paid to Zybin based on representation made by

Zybin at the closing. (2/19/13 Tr. at 46:18-22.) Krishtul concedes, however, that he lacks "physical proof" of payment to Zybin. (*Id.* at 72:21-24.) To that end, he acknowledges that the Mortgage Disbursement Sheets do not reflect payment to Zybin. (*Id.* at 47:19-48:1.) With no physical evidence to speak of, Krishtul submits that Zybin was paid "indirectly" out of the loan proceeds. (*Id.* at 73:17-20)

For his part, Raytburg testified that VSLP extended Krishtul a one-year loan at 14 percent interest with two points up front. (2/19/13 Tr. at 100:3-5, 100:13-14.) Raytburg contends that he received those points, allowing him a profitable return of 16 percent, as he in turn borrowed the loan principle at an interest rate between 8 and 10 percent. (*Id.* at 100:6-12.) He denies that VSLP paid any mortgage broker in connection with the 2007 VSLP Loan. (*Id.* at 99:25-100:2; *see also id.* at 98:25-99:12.) Consistent with Raytburg's testimony, VanderNeut testified that he has no knowledge of a mortgage broker being involved in the 2007 or 2008 VSLP Loans. (2/20/13 Tr. at 144:15-20.) He attests that there was never any discussion about mortgage broker fees at either the closing or the funding of the 2007 VSLP Loan. (*Id.* at 144:9-14.) In particular, VanderNeut denies any discussion about the payment of two points to Zybin or Stanley Capital, and disavows facilitating any money to Zybin. (*Id.* at 144:20-145:6.)

Similarly, Zybin testified that neither he nor his employer Stanley Capital received points, compensation, or anything of value in connection with the loan extended by VSLP. (2/20/13 Tr. at 118:13-119:2.) He further testified that he never had any discussion about being paid points. (*Id.* at 117:10-12.) Zybin avers that he was "not at the closing on Staten Island" (*Id.* at 116:3-8), although he was "partially" present at the later funding, which due to a "logistical issue" occurred at his office in Brooklyn. (*Id.* at 116:9-23.) Nonetheless, Zybin attests that he "really had

14

nothing to do with [the funding]." (*Id.* at 117:5). Finally, Zybin testified that he does not know, nor has he done business with, Turner, Broadscope Capital, Epelman, Donahue, or First Capital Mortgage. (*Id.* at 117:16-118:12.)

For clarity of discussion, the Court saves its evaluation of the evidence for the legal analysis below, with only a brief comment on the witnesses' credibility. Without mincing words, the Court finds no one witness particularly credible. To be sure, certain aspects of the testimonial evidence rang true. But in terms of demeanor, candor, and presentation, none of the witnesses appeared overwhelmingly credible. Accordingly, inasmuch as the Court makes factual findings below, it is guided more by the weight and consistency of the evidence than a strong conviction about the veracity of any given witness.

## B.    Conclusions of Law

### 1.    *The VSLP Loans are Consumer Credit Transactions*

TILA does not apply to "[c]redit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes." 15 U.S.C. § 1603(1); Reg. Z § 226.3(a)(I). Where the parties disagree as to the type of transaction, the plaintiff bears the burden of showing that the subject transaction was "'a consumer credit transaction, not a business transaction.'" *Macheda v. Household Fin. Realty Corp. of N.Y.*, No. 04–CV–0325 (GTS) (GJD), 2009 WL 113474, at *5 (N.D.N.Y. Jan. 15, 2009) (quoting *Searles v. Clarion Mortg. Co.*, No. 87–CV–3495, 1987 WL 61932, at *3 (E.D. Pa. Dec.7, 1987)). Thus, Krishtul has the burden of proving that the loans at issue were obtained primarily for personal, as opposed to business, purposes. *See Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 154 (E.D.N.Y. 2010) (citations omitted).

15

The Second Circuit has not articulated a standard for determining the primary purpose of a loan transaction.  In evaluating loans made for both consumer and business purposes, some courts have applied a "quantitative approach," to determine "whether a majority of the loan proceeds were used for commercial purposes or consumer purposes."  *See Graham v. Manley Deas Kochalski LLC*, No. 08–CV–120, 2009 WL 891743, at 8 (S.D. Ohio Mar. 31, 2009) (citing cases).  Other courts have employed the "original purpose analysis," which requires a "step-by-step" evaluation of each transaction separately, "looking to the original purpose of each loan throughout the life of the loan."  *Id.* (citing cases).  However, "[m]ost [] courts that have addressed the issue have held that a court must look at the entire transaction and surrounding circumstances to determine a borrower's primary motive."  *Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d at 153.  *See also Shames-Yeakel v. Citizens Fin. Bank*, 677 F. Supp. 2d 994, 1002 (N.D. Ill. 2009); *Hinchliffe v. Option One Mortg. Corp.*, No. 08–CV–2094, 2009 WL 1708007, at *3 (E.D. Pa. June 16, 2009); *Macheda v. Household Fin. Realty Corp. of N.Y.*, 2009 WL 113474, at *5 (collecting cases).  "The focus in determining whether a transaction is consumer or commercial is not on the nature of the property, but instead on the use of the loan proceeds."  *Muia v. Brookview Rehab Funding*, No. 10–CV–01315 (LEK)(RFT), 2011 WL 1748190, at *2 (N.D.N.Y. May 5, 2011) (citing *Hinchliffe v. Option One Mortg. Corp.*, 2009 WL 1708007, at *4)

The Court concludes that the primarily purpose of the 2007 VSLP Loan was to refinance the Lipkin Loan.  Krishtul credibly testified that he obtained the Lipkin Loan to refinance an existing loan secured by the Co-op and to settle his personal affairs following a bitter divorce.  As the Lipkin Loan neared maturity, Krishtul needed to refinance with another lender, because

16

Lipkin would not renew the loan or extend its term. Certainly Krishtul also intended to acquire cash-out proceeds. But it is reasonable to infer from the circumstances that the refinance was the primary purpose for obtaining the 2007 VSLP Loan.

That said, the Court recognizes that certain factors point to a business purpose loan. In particular, Krishtul appears to operate his business from his home, such that refinancing a loan secured by the Co-op serves both personal and business ends. Additionally, the Court agrees with VSLP that Krishtul used the cash-out proceeds in connection his business. This factor is just one among many, however, and VSLP appears to overstate the significance. Under some circumstances, the disposition of the remaining loan proceeds may take on particular importance. *See, e.g.*, *Gambosi v. Carteret Mortg. Corp. et al*, 894 F. Supp. 176, 181 (E.D. Pa. 1995) (finding that, where the "the primary purpose of the [subject] loan was to acquire the remaining proceeds after the satisfaction of all the conditions of obtaining the loan," the use of "those remaining proceeds must weigh heavily in determining the primary purpose" of the loan). But in this case, the desire to obtain the cash-out proceeds was a secondary reason for the transaction and so it follows that the disposition of such proceeds carries less weight. Moreover, the cash-out proceeds comprised a relatively small proportion of the 2007 VSLP Loan.

Having considered the totality of the circumstances, the Court concludes that the 2007 VSLP Loan was primarily for a consumer purpose. The Court further concludes that this consumer purpose dominated the 2008 VSLP Loan, which operated only to refinance the previous loan, with no cash-out. Based on these factual findings, the Court concludes that the 2007 and 2008 VSLP Loans are consumer purpose loans subject to TILA.

17

2.   **_VSLP is Not a Creditor_**

TILA imposes civil liability only upon "creditors" as defined by § 1602(g) of the statute. The definition of "creditor" includes, in relevant part, "[a]ny person who originates 2 or more [high-cost mortgages] in any 12-month period or *any person who originates 1 or more such mortgages through a mortgage broker . . . .*"  15 U.S.C. § 1602(g) (emphasis added); *see also* 12 C.F.R. § 226.2(a)(17)(v).  The parties dispute whether the 2007 VSLP Loan originated through a "mortgage broker"—a term that neither TILA nor Regulation Z defined at the time of the transaction.  Following extensive briefing on the issue at the summary judgment phase, the Court adopted the New York Banking Law definition of the term "mortgage broker," expressly noting that "[t]his definition includes an element of compensation or gain."  (Mem. & Order at 10.) Applying this definition, the Court found that Krishtul was estopped from asserting that Broadscope Capital and Epelman acted as mortgage brokers in connection with the 2007 VSLP Loan, due to his contemporaneous writing that payments made to them from the loan proceeds were for "services provided outside of this loan transaction with VSLP."  (*Id.* at 11-15.)  These determinations constitute the law of the case.  *Pescatore v. Pan American World Airways, Inc.*, 97 F.3d 1, 7-8 (2d Cir. 1996) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (citation and quotation marks omitted).

Put plainly, the parties' dispute boils down to whether Krishtul can establish that certain individuals and/or entities received compensation for their alleged mortgage brokerage activities. Krishtul contends that a number of mortgage brokers led to his introduction to Raytburg, who ultimately offered him the 2007 VSLP Loan.  Krishtul offered no evidence other than his own

18

testimony, much of which made impermissible reference to the disbursements to Broadscope

Capital and Epelman as mortgage broker fees.  (*See, e.g.*, 2/19/13 Tr. at 46:4-17.)  Although

Krishtul did refer to a telephone call during which Turner expressed concern that he and

Donahue would lose their commission (*id.* at 43:14-19), the Court declines to afford such

conclusory testimony much evidentiary value.  As to the alleged fees paid to Zybin, Krishtul

stated conclusively that he knows Zybin was paid because Zybin told him as much.  (*Id.* at 46:18-

22.)

Whereas Krishtul relies only on his own testimony, VSLP offered the testimony of Zybin,

VanderNeut, and Raytburg, all of whom consistently testified that no mortgage broker was

involved in the 2007 and 2008 VSLP Loans.  Zybin testified that he made only a basic

introduction and denies that he received any points in connection with the 2007 VSLP Loan.

(2/20/13 Tr. at 114:8-12, 118:25-119:2.)  Finally, VanderNeut affirmed that he was unaware of

any mortgage broker involved in the 2007 and 2008 VSLP Loans.  (*Id.* at  144:15-20.)  Zybin and

Raytburg further denied that they have ever worked with any of the individuals or entities

referenced by Krishtul.

Based solely on the weight of the evidence submitted at trial, the Court concludes that

Krishtul failed to establish that Zybin or any other mortgage broker received compensation or

other monetary gain in connection with the 2007 VSLP Loan.  Krishtul has therefore failed to

establish that the 2007 VSLP Loan originated through a mortgage broker such that VSLP is a

creditor within the meaning of TILA.  As VSLP is not a creditor, it cannot be held liable under TILA, and Krishtul's claim must fail.[4]

### C.     VSLP's Counterclaim for Legal Expenses

#### 1.     <u>Attorney's Fees</u>

VSLP seeks $79,587.93 for attorney's fees and costs incurred in defending against this action.  Pursuant to the Loan Security Agreements, VSLP is entitled to recover legal expenses, including attorney's fees, together with interest at a rate of 16 percent per year where it "becomes necessary to defend or uphold the lien of this security agreement."  (2007 Loan Security Note ¶ 15; 2008 Loan Security Agreement ¶ 15.)  Such legal expenses "may be added to the debt secured by this loan security agreement and shall be repaid to the lender upon demand."  (2007 Loan Security Note ¶ 15; 2008 Loan Security Agreement ¶ 15.)  Krishtul brought the instant action seeking, among other relief, to void VSLP's security interest in the Apartment.  (Compl. at 7.)  Accordingly, as a contractual matter, VSLP is entitled to recover its legal expenses by the express terms of the Loan Security Agreements.

Courts in the Second Circuit evaluate the reasonableness of an attorney's fee award under the "presumptively reasonable fee" standard, which is equal to a reasonable hourly rate multiplied by a reasonable number of hours expended.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany,* 522 F.3d 182, 190 (2d Cir. 2007).  District courts have broad discretion, using "'their experience with the case, as well as their experience with the

---

[4] As the Court finds TILA inapplicable to the transactions at issue, it need not address VSLP's alternative arguments that Krishtul's claim for monetary damages is barred by the statute of limitations, that any TILA violation by VSLP was the result of a bona fide error, or that VSLP is entitled to receive its loan principal prior to the release of its security interest. (*See,e.g.*, Dkt. No. 39 at 18-23; *see also* VSLP FFCL ¶¶ 86-87.)

practice of law, to assess the reasonableness'" of each component of a fee award.  *Fox Indus., Inc. v. Gurovich*, No. 03–CV–5166 (TCP) (WDW), 2005 WL 2305002, at *2 (E.D.N.Y. Sept. 21, 2005) (quoting *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992)).

A reasonable hourly rate is "the rate a paying client would be willing to pay," mindful that "a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively."  *Arbor Hill*, 522 F.3d at 190.  Reasonable hourly rates are determined by examining the "[rates] prevailing in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation."  *Cruz v. Local Union No. 3 of IBEW*, 34 F.3d 1148, 1159 (2d Cir. 1994) (quoting *Blum v. Stenson*, 465 U.S. 886, 894 (1984)) (brackets in original).  In the Eastern District, hourly rates range "between $300 and $450 for partners, between $200 and $300 for senior associates and between $100 and $200 for junior associates."  *E. Sav. Bank, FSB v. Bright*, No. 11–CV–1721 (ENV) (MDG), 2013 WL 3282889, at *5 (E.D.N.Y. June 27, 2013) (citing *Luca v. County of Nassau*, 698 F. Supp. 2d 296, 301–05 (E.D.N.Y. 2010)).  Attorney's fee awards tend to be lower, however, in cases involving mortgages and promissory notes.  *Id.* (citations omitted); *see, e.g.*, *Home Loan Inv. Bank, F.S.B. v. Lemans Props, LLC*, No. 11–CV–1107 (DRH) (AKT), 2012 WL 1020430, at *7 (E.D.N.Y. 2012) (awarding rates of $275 per hour to partner and $175 per hour for associates); *Bank of Am. v. Viders*, No. 10-CV-0025 (DRH) (ARL), 2011 WL 4527419, at *3 (E.D.N.Y.2011) (awarding rates of $250 per hour for partner and $175 per hour for associate); *BH99 Realty, LLC v. Qian Wen Li*, 2011 WL 1841530, at *7 (E.D.N.Y.2011) (same).

Here, VSLP requests $400.00 per hour for attorney Thomas J. Hall, a partner at Hall & Hall since 1992 with significant experience in mortgage foreclosures and real estate matters, and

21

$250.00 per hour for Katherine A. Buchanan, a 2011 graduate of Seton Hall University School of Law.  (*See* Dkt. No. 77 ("Hall Decl.") ¶ 7.)  Although not a perfect comparison, the instant matter falls within the realm of cases involving promissory notes and mortgages, such that the lower attorney's fee awards approved in this District for foreclosure actions provide a useful starting point.  As such, the Court concludes that a reasonable, paying client would not be willing to pay the $400 per hour that VSLP seeks for its counsel, which in any event, appears to be on the higher end of the range awarded in this District.  *See, e.g.*, *Konits v. Karahalis*, 409 F. App'x 418, 422–23 (2d Cir. 2011) (recognizing prevailing rates for "experienced attorneys" in this District range from $300–400 per hour).  That said, the depressed rates approved in garden variety foreclosure actions are also inappropriate.  Having presided over this case, the Court is aware that defense counsel capably litigated legal issues that are still developing in this Circuit.  Accordingly, based on precedent, as well as on my knowledge of this case, the Court awards fees based on a rate of $300 for Thomas Hall and $175 for Katherine Buchannan.

As to the hours expended, VSLP has submitted contemporaneous time records and a declaration by Hall to establish the number of hours expended and the nature of the legal work performed.  (*See* Hall Decl. ¶¶ 8-9; Dkt. No. 46 ("Contemporaneous Time Records").)  The records reflect that Hall and Buchanan expended 219.3[5] and 2.4 hours, respectively, in litigating this case.  The Court finds that the amount of time expended to be reasonable, particularly given the substantive motion practice by the parties.  Accordingly, the Court does not find a reduction in hours is warranted.

---

[5]  This number includes the 3.25 hours expended by Hall on February 20, 2013.  (*See* Hall Decl. ¶ 8.)

Therefore, applying the adjusted hourly rates of $300 for the 219.3 hours of work expended by Hall, and $175 for the 2.4 hours of work expended by Buchanan, the Court awards a total of $66,210.00 in attorney's fees.

**2.   _Other Costs_**

VSLP seeks reimbursement of $1,047.93 for litigation expenses, including the cost of postage, depositions, filing costs, and parking fees.  (_See_ Contemporaneous Time Records at 19; Hall Decl. ¶9.)  The 2007 and 2008 Loan Security Agreements provide for reimbursement of "the expense of any litigation."  (_Id._ ¶ 15.)  These costs constitute "the expense of [ ] litigation" within the meaning of the 2007 and 2008 Loan Security Agreements and are therefore recoverable. Accordingly, VSLP is entitled to $1047.93 for costs.[6]

---

[6]  The 2007 and 2008 Loan Security Agreements appear to provide for litigation expenses plus interest at a rate of "sixteen (16%) percent per annum."  (_Id._ ¶ 15.)  An award of interest is not mandatory under the agreements.  (_Id._ (stating that interest "_may_ be added to the debt" (emphasis added).)  Although pled in its answer (_see_ ¶¶ 35-33), VSLP does not appear to request such interest at this juncture and Court therefore declines to award interest on the attorney's fee and other costs.

## CONCLUSION

For the reasons set forth above, Krishtul's TILA claims are dismissed in their entirety and VSLP is awarded attorney's fees and costs in the amount of $67,257.93, which is to be added to the preexisting debt secured by the parties' loan security agreements.  The Clerk of the Court is respectfully directed to enter judgment in accordance with this Order, to serve this Order and appeals packet on Igor Krishtul at the addressed listed on the docket, and to close the case.

**SO ORDERED.**

March 11, 2014
Brooklyn, New York

*Ramon Reyes Jr.*

**Ramon E. Reyes Jr.**
**United States Magistrate Judge**

24